U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB - 7 2013

CLERK, U.S. DISTRICT COURT
By _____
     Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

HARVEY YODER D/B/A MARKETING    §
GROUP,                          §
                                §
         Plaintiff,             §
                                §
VS.                             §    NO. 4:12-CV-150-A
                                §
U.S. FINANCIAL LIFE             §
INSURANCE COMPANY,              §
                                §
         Defendant.             §

<u>MEMORANDUM OPINION</u>
and
<u>ORDER</u>

Now before the court is the motion for summary judgment
filed in the above action by defendant, U.S. Financial Life
Insurance Company ("USFL").[1] Plaintiff, Harvey Yoder d/b/a
Marketing Group ("Yoder"), filed a response to the motion, each
party filed a brief and an appendix, and defendant filed a reply.
Having now considered all these items, the entire summary
judgment record, and applicable legal authorities, the court
concludes that the motion should be granted.

I.

<u>Plaintiff's Claims</u>

Plaintiff initiated this removed action by the filing of his
verified original petition in the District Court of Tarrant

---

[1] Plaintiff also named AXA Financial Group, AXA Partners, and AXA Distributors, LLC as
defendants in his original complaint, but those defendants have since been dismissed, leaving USFL as
the remaining defendant.

County, Texas, 352nd Judicial District, asserting a cause of action for breach of contract against defendant. Plaintiff alleged that defendant breached a general insurance agency agreement dated April 4, 2005, ("2005 agreement") by failing to pay commissions pursuant to the terms of the agreement. Plaintiff seeks damages including lost commissions, lost bonuses, and other consequential, incidental, and reliance damages. Plaintiff also seeks restitution and attorney's fees.

II.

The Summary Judgment Motion

Defendant argues for summary judgment on the grounds that it is entitled to judgment as a matter of law for several reasons: (1) Under the 2005 agreement, defendant had the right to change the commission schedule at any time and, therefore, did not breach the agreement by reducing the commission rates for conversions; (2) A conversion represents a new policy, and the rate of commission to be paid on a conversion is determined by the commission schedule in place at the time the conversion occurs, not the commission schedule in place when the original policy is issued; (3) Under the 2005 agreement, defendant had the right to change the bonus plan at any time; (4) plaintiff's claim for consequential damages is too speculative; and (5) plaintiff's claim to accelerate future commissions on conversions that may occur or should have occurred is barred because plaintiff cannot

prove an anticipatory breach of the agreement.  Def.'s Br. at 4.

III.

## Undisputed Facts

The following facts are undisputed in the summary judgment record:

Defendant is a life insurance company that specialized in the impaired risk market, and sold primarily term life insurance and universal life insurance policies.[2]  Some of defendant's term policies contain a conversion provision allowing the insured, subject to certain conditions and within a specified time, to convert the policy to a universal life insurance policy without having to provide evidence of insurability.  Defendant performs the conversion based on the underwriting that was used for the issuance of the original term policy.  To make such a conversion, an individual is required to apply in writing to defendant's home office while the term policy is in force, and must include the portion of the "face amount" of the policy he or she wishes to convert.  The individual has a limited amount of time to convert the policy, and needs to provide his or her age on the application because some policies require the insured to convert by a certain age.  When defendant approves a conversion, it issues a universal life policy to the insured, with a new policy

_____

[2] Defendant merged into AXA Financial Company in 2007, and discontinued new business operations effective July 20, 2007.

number, issue date, and a policy "folder" outlining the policy's terms and conditions. The agent who handles the conversion need not be the same agent who handled the original policy application.

Defendant sold its insurance policies through a network of general agents, and plaintiff is one of those general agents. General agents recruited teams of "downline" brokers, who solicited applications for new life insurance policies from customers. Defendant paid base commissions to the brokers and override commissions to the general agents based on a percentage of the premiums that were collected. Typically, defendant paid a higher percentage for premiums collected during the first year of a new policy, and smaller percentages for renewal premiums paid in subsequent years that the policy remained in force. Defendant also paid its general agents bonuses, which varied over time and were not guaranteed, but were generally based on the total amount of first-year premiums collected and were paid according to a tiered plan.

In 1992, plaintiff joined defendant as a general agent. At the "peak" of plaintiff's tenure as a general agent, he had approximately 300 downline brokers working for him, and he also made agreements with other general agents, who agreed to be "associate general agents" or "sub-general agents" (collectively, "sub-agents"). The sub-agents would pool their total first-year

premiums with plaintiff in order to collectively reach a higher bonus tier. While sub-agents would keep their general agent commissions, they would split their bonuses with plaintiff. Even though the sub-agents split their bonuses with plaintiff, the sub-agents still enjoyed a higher net income by pooling with plaintiff.

When defendant hired plaintiff in 1992, the parties executed a general agent agreement ("original agreement"). Under the original agreement, plaintiff received a commission of between twenty and twenty-five percent on first-year premiums and between one and three percent on renewals. Under defendant's bonus program, which applied only to universal life insurance plans, plaintiff could be paid between five and forty-five percent of the premiums collected on which first-year commissions were payable. The original agreement also provided that: (1) "[i]f a policy is changed, converted, replaced, or reinstated, the amount of your commission payment will depend on current published procedures;" (2) defendant "may change the commission schedule" and that "[a]ny such change will apply only to applications solicited after the effective date of such change;" and (3) plaintiff's "rights to payment of commissions are immediately vested under this Agreement, unless [plaintiff is] terminated for cause." Pl.'s App. at 107; Def.'s App. at 137-41.

In March 2005, defendant introduced a new general agent

agreement, the 2005 agreement pursuant to which plaintiff filed this action and which plaintiff signed on April 4, 2005. Defendant has been unable to locate a copy of the 2005 agreement bearing the signature of a representative of defendant. Like the original agreement, the 2005 agreement provided that defendant "may change the commission schedule or bonus plan. Any such change will apply only to business settled after the effective date of such change." Def.'s App. at 170. The 2005 agreement further provided:

> Change, Conversion, Replacement, Reinstatement:
> Any policy that is intended to replace an
> existing . . . policy . . . is not eligible for first
> year commission except to the extent that the new
> commissions exceed the previous commission payments.
>
> Your right to payment of commission on a policy vests
> when the policy is placed in force and [defendant] has
> accepted the first premium on the policy. Once the
> right to commission on a policy has vested, you have
> the right to receive all future commissions on that
> policy unless this agreement is terminated for good
> cause. Commissions do not include service fees or
> bonus payments.

Id. At the same time the agreement was introduced, defendant provided plaintiff with an amended commission schedule, and modified the general agent bonus plan, which stated that "[t]he company may terminate this Bonus plan for any General Agent at the company's discretion, at any time." Id. at 159. Plaintiff was paid commissions and bonuses based on the amended commission schedule and bonus plan beginning in March 2005.

On June 28, 2007, defendant, which was struggling financially, announced that it would cease writing new business as of July 20, 2007. As a result, the bonus program was essentially shut down, as bonuses were paid only on new business. On October 15, 2007, defendant informed agents and brokers, including plaintiff, that "[f]irst year commissions will no longer be paid on term conversions, exchanges, replacements or face amount increases." Def.'s App. at 180. Defendant continued to pay commissions at the rate of two to three percent on all policies that were in force and on all conversion policies issued after December 1, 2007.

IV.

Analysis

A.  Applicable Summary Judgment Principles

Rule 56(a) of the Federal Rules of Civil Procedure provides that the court shall grant summary judgment on a claim or defense if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The movant bears the initial burden of pointing out to the court that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). The movant can discharge this burden by pointing out the absence of evidence supporting one or more essential elements of the

nonmoving party's claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

Once the movant has carried its burden under Rule 56(a), the nonmoving party must identify evidence in the record that creates a genuine dispute as to each of the challenged elements of its case. Id. at 324. See also Fed. R. Civ. P. 56(c) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ."). If the evidence identified could not lead a rational trier of fact to find in favor of the nonmoving party as to each essential element of the nonmoving party's case, there is no genuine dispute for trial and summary judgment is appropriate. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 597 (1986).

B.   Operative Contract

Plaintiff brought the above-captioned action based on the 2005 agreement, alleging that defendant breached that agreement. Notice of Removal, Ex. D-4 at 4-5, 8-14. Now, in plaintiff's response to defendant's summary judgment motion, plaintiff for the first time contends that the 2005 agreement was not, and is not now, the operative contract between the parties, arguing that there was never a meeting of the minds because (1) plaintiff made handwritten notes on the agreement indicating that he questioned

parts of it; (2) plaintiff asked defendant to return the agreement to him; and (3) the agreement does not contain the signature of a representative of defendant. Pl.'s Br. at 12-14. Plaintiff then contends that because of the deficiencies of the 2005 agreement, the operative contract between the parties is an implied contract. Plaintiff contends:

> Because [plaintiff] and [defendant] do not have a signed contract in force, but have always operated as if a contract had been in place, an implied-in-fact contract must be present. The terms of the implied contract can be determined by a course of dealing that has spanned nearly two decades, which has included the payment of commissions on term conversions. Because [defendant] has always paid commissions on converted policies up until it made the decision to eliminate them in 2007, [defendant] breached its agreement with [plaintiff] when it ceased paying in accordance with this vested right.

Pl.'s Br. at 14. Plaintiff does not refer to the original agreement, but focuses on his contention that since defendant has historically paid plaintiff commissions at the higher first-year rate on conversions, and the 2005 agreement is not valid, then defendant must be required to continue paying conversions at the first-year rate, apparently regardless of the original contract's provision that defendant could change commission rates at any time.

Plaintiff's contention makes little sense, and is belied by the record and plaintiff's own actions and admissions, which indicate that plaintiff believed the contract to be valid and

believed that both parties were required to operate pursuant to its terms. First, plaintiff brought this action pursuant to the 2005 agreement, filing a verified petition for breach of contract, citing the 2005 agreement, and attaching the 2005 agreement to his petition. Second, plaintiff responded to an interrogatory that asked him to identify all contracts he contended defendant had breached, to which plaintiff responded:

> Defendant breached its contract with Plaintiff when Defendant unilaterally decided to no longer pay first year conversion commissions on existing term life insurance policies to which Plaintiff had a vested right in future commissions. See General Agent Agreement attached hereto as Exhibit 4 [2005 agreement]. More specifically including, but not limited to Exhibit 4, Paragraphs V and VI.

Def.'s App. at 185. Next, plaintiff testified under oath in his deposition that defendant breached the 2005 contract:

> Q: And if I understand it correctly, the contract that you are basing your claims on, the contract that you claim was breached by [defendant] is the contract that is attached to your petition, which is your 2005 General Agent Agreement with [defendant]?
>
> A: Yes, ma'am.

Id. at 8-9. Plaintiff also included the following in his response to defendant's request for disclosure:

> Plaintiff's compensation package, as set forth in his written agreement dated April 4, 2005, included first year and renewal commissions, service fees and applicable bonuses on eligible paid premiums accepted for policies Plaintiff or his agents wrote for [defendant].

\*\*\*

10

> Defendants' actions and failure to pay the commissions
> agreed upon in the General Agent Agreement constitute
> a breach of the contract signed with Plaintiff, and
> Plaintiff has incurred damages as a direct and
> proximate result.

Notice of Removal, Ex. A: Pl.'s Resp. to Def.'s request for

Disclosure, at 3.

In addition to plaintiff's admissions and sworn testimony

confirming that his action for breach of contract was based on

the 2005 agreement, the undisputed facts show that the parties

operated under such agreement. Plaintiff sold insurance

policies, and defendant paid commissions and bonuses to

plaintiff pursuant to the 2005 agreement and its attached

schedules. Plaintiff accepted such commissions and bonuses

without complaint, and plaintiff has admitted that he and

defendant operated under the agreement and its attachments.

Def.'s App. at 77-79. Thus, the court concludes that the 2005

agreement is valid and is the operative contract between the

parties.

C.   Conversion Commissions

Defendant argues that conversions are new policies, and,

therefore, payment of commission to agents on conversions is

subject to the current commission schedules, not the rate in

effect at the time the original policy was issued. Plaintiff

contends that a conversion does not create a new policy, but is

merely a continuation of the original policy, and, therefore, an agent's right to be paid a certain rate of commission vests when the original policy is issued. Also, defendant argues that it had the right to change the commission schedule for conversions at any time, as the 2005 agreement provides that defendant "may change the commission schedule" and that any change would apply to "business settled after the effective date of such change." Def.'s App. at 170. Plaintiff also contends that, even if defendant had the right to "change" the schedule, defendant cannot "eliminate" the payment of first year premiums on conversions, and plaintiff describes defendant's reduction of conversion commission rates to equal renewal commission rates as such an elimination.

1.  Whether a Conversion is a New Policy, or a Continuation of the Original Policy

The parties disagree as to whether a conversion is an entirely new policy that is subject to the commission schedule in effect at the time of the conversion, or whether the conversion is a continuation of the original policy and subject to the commission schedule in place at the time the original policy went into effect. Defendant contends that a conversion is a new policy, evidenced by the fact that a conversion (1) requires a new application, (2) results in a different policy with different coverages from the original policy, (3) has a new

policy number, (4) has new premiums, (5) has new policy documents, and (6) has an effective date that is the date of the conversion.

Defendant also cites cases, from other jurisdictions, with similar facts and issues concerning agents' commissions on converted policies, in which courts have determined that a converted policy is a new policy for purposes of an agent's compensation. For example, in <u>Occidental Life Insurance Company of California v. Marmaduke Corbyn Agency</u>, 187 F.2d 553 (10th Cir. 1951), the court examined whether an agent was entitled to commissions on converted term policies where the term policies were issued during the existence of the agent's contract, and the conversion occurred after the agent's contract was terminated. Although the court needed to interpret the specifics of the contract at issue for part of its decision, the court stated that "[i]t is without dispute that when a term policy is converted, the policy is surrendered and a new policy is issued," <u>Id.</u> at 556, and cited to a case from the Virginia Supreme Court for the proposition that a converted policy was a new policy and not a continuation of the old policy. <u>See</u> <u>Geisler v. Equitable Life Assurance Soc.</u>, 192 S.E. 703, 704-05 (Va. 1937) (finding that an insurance company did not have to pay commissions to an agent for policies, including conversions that required no additional medical information, written after

13

the agent's contract was terminated because such policies were not issued during the period the contract was in force).

Plaintiff contends that converted policies should be treated as continuations of the term policies, so long as the terms are similar. Plaintiff cites cases which primarily regard policyholders' and beneficiaries' rights under converted policies, and fail to address whether a converted policy is a new policy for purposes of an agent's compensation. For example, plaintiff quotes Cormack v. Aspentech, No. 01-99-00444-CV, 2000 WL 330179 (Tex. App. Houston [1st Dist.] Mar. 30, 2000, pet. denied), for the argument that when a policyholder applies "to change certain aspects of the policy," such an application is not considered a "new application." In Cormack, the insured's former employer and the insured's widow disagreed over which party had the rights to the insurance proceeds, when the insured had named the employer as beneficiary on the original application, filled out an application for a "policy change" six years later, and identified the beneficiary in such application as "Same as Original Policy." Id. at *1-2. Attempting to have the funds distributed to her, the widow argued that the application to make a policy change was a new application, and that the reference to the beneficiary did not satisfy statutory requirements for new applications. Id. at *3. The court determined that the application was not a new

application, and that the original application had complied with the statute, without concerning itself with the issue of whether a converted policy is a new policy.  Id.

Thus, Cormack involves a context entirely different from this case, involving a dispute as to who the beneficiary could be and whether an application complied with a statute, not whether a policy converted under the same type of circumstances as this case should be a new policy for the purposes of determining an agent's right to commissions.  Plaintiff's other cited cases are also distinguishable from this action for similar reasons, as each one involved substantive rights and entitlements under the policies, not an agent's right to a particular commission.  See Swanson v. First Fidelity Life Ins. Co., 335 N.W.2d 538 (Neb. 1983) (determining that when an original term policy had a "suicide clause," and the policy was later converted to whole life, the suicide clause did not start to run again from the time of conversion, focusing on the "principal risk insured against" in both policies); Occidental Life Ins. Co. of N.C. v. Hurley, 513 S.W.2d 897, 901 (Tex. App.--Amarillo 1974, no pet.) (finding that the insurer had the same obligations to the insured under a converted policy that it had under the original policy, the insured had the rights to the same substantive benefits, and that a suicide provision "was conditioned upon and related back to" the original agreement).

Although the cases cited by plaintiff hold that many of the same benefits from an original term policy continue to apply in a converted policy, the cases cited by defendant in the context of commissions due to an agent are more applicable to the facts and circumstances of this action. Further, the facts show that plaintiff and defendant treated conversions as new policies in the past, as defendant historically paid a higher commission rate during the first year of a converted policy than it paid in subsequent years. The characteristics of the converted policy, such as the application requirement, policy number, documentation, premiums, and effective date, also weigh in favor of the determination that a conversion is a new policy, as does the fact that the conversion application could be handled by an agent different from the agent who handled the application for the original policy. Finally, the language of the 2005 agreement is instructive, stating that plaintiff's "right to payment of commission on a policy vests when the policy is placed in force and [defendant] has accepted the first premium on the policy." Def.'s App. at 170. It logically follows that a policy cannot be "placed in force" until it exists and that defendant cannot accept any premiums until such premiums are calculated and set forth in the policy documentation. Thus, plaintiff's right to payment cannot vest until the actual conversion takes place and the converted policy is in force, and

a conversion must be considered a new policy, subject to the commission schedule in place at the time of the conversion.

　　2.　Defendant's Change of the Commission Rate for Conversions

Defendant argues that it has the right to change the rate of commission it pays on conversions before such conversions have taken place, and plaintiff concedes that defendant has such a right. Def.'s App at 56-57; 66-67; Pl.'s App. at 65. While plaintiff concedes that defendant has the right to change such rates, he argues that defendant does not have the right to eliminate first year commissions on conversions. Plaintiff contends that defendant, by setting the first year commission rate for conversions at the same level as the rate for renewals, eliminated an "entire category" of commissions and therefore breached its obligation to plaintiff.

Under Texas law, a successful breach of contract claim requires proof of (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by defendant; and (4) damages sustained by plaintiff as a result of the breach. Petras v. Criswell, 248 S.W.3d 471, 477 (Tex. App.--Dallas 2008, no pet.). Where the facts are not disputed regarding a party's conduct under a contract, the court determines whether such conduct shows performance or breach of the contract obligation. Lafarge Corp. v. Wolff, Inc., 977

S.W.2d 181, 186 (Tex. App.--Austin 1998, pet. denied). As the court has already determined that the 2005 agreement constitutes a valid contract, and there is no contention that plaintiff failed to perform, the court considers whether defendant's actions in changing the commission schedule amount to a breach of the 2005 agreement, specifically whether the change should be characterized as a permissible "reduction" in commission, or an impermissible "elimination" of vested commissions.

Plaintiff's argument for elimination relies on language used in discussions between defendant's representatives regarding the decision to stop writing new business and the determination of whether to continue paying conversion commissions at the first year rate. For example, meeting minutes dated October 12, 2007, state, "A decision was made that commissions will no longer continue on face amount increases and conversions." Pl.'s App. at 158. A powerpoint presentation indicated that defendant intended to "eliminate first year commissions on conversions." Pl.'s App. at 180. Plaintiff also refers to correspondence he received from defendant. The first, dated October 15, 2007, states:

> As you know, [defendant] ceased accepting business as
> of July 27, 2007. This decision does not affect any
> policies in force. . . .
>
>
> Renewal commissions will continue to be paid on
> policies in force.

> First year commissions will no longer be paid on term
> conversions, exchanges, replacements, or face amount
> increases.

Pl.'s App. at 114. The next document, a "field bulletin"

dated October 26, 2007, states:

> First-year commissions will no longer be paid . . . on
> new requests for face increases, term conversions,
> exchanges and replacements with policy effective dates
> of **December 1, 2007** and later. This does not affect
> those already in place. Renewal commissions will
> continue to be paid on inforce policies under the
> current vested schedule.

Pl.'s App. at 116 (Emphasis in original). Plaintiff argues that

the above statements establish that defendant "eliminated"

commissions that would have been paid to plaintiff upon a

conversion. Defendant argues that, when "[r]ead in context, the

announcement obviously used the term 'first-year commissions' to

mean the traditional commission <u>rate</u> of 25-30% paid on premiums

in the first year since it is undisputed that [defendant]

continues to pay commissions for premiums received that first

year, just at the lower rate of 2-3%." Reply at 6 (Emphasis in

original). Defendant thus contends that the fact remains that

first year commissions were not eliminated, but are being paid

at a lower rate, and defendant had the right to institute such

lower rate.

It is clear from the plain language of the agreement that

defendant had the right to change the commission schedule and

bonus plan at any time, and commissions for all conversion

policies have been and continue to be paid based on the commission schedule and premium table in effect at the time the converted policy was issued. While the reduction in the commission rate was rather steep, there is nothing in the agreement or in the summary judgment record to indicate that defendant did not have the right to implement such a reduction. The fact that commissions are still being paid at the published rate establishes that they have not been eliminated.

D.   Plaintiff's Remaining Claims

As defendant explains, it is unclear whether plaintiff has attempted to assert a claim for lost bonuses in addition to lost commissions. Plaintiff's pleadings do not mention lost bonuses, but plaintiff refers to such lost bonuses in his deposition and in his brief in support of his response to the summary judgment motion. Plaintiff contends that he suffered damages with regards to "lost bonus payments associated with the conversions." Pl.'s Br. at 4. Plaintiff also claims that he suffered "future damages based on conversion-eligible policies that remain in force" and "lost commissions on policies that would have converted but for [defendant's] decision to cease paying first year commissions on conversions." Id. Such claims all rely on plaintiff's contention that defendant improperly changed the rate at which it pays commissions on conversion policies, and such contention has already been rejected by the

court.  Thus, the court need not go any further in considering the arguments raised by plaintiff with regards to lost bonuses or other damages.

## V.

## Order

Therefore,

The court ORDERS that defendant's motion for summary judgment be, and is hereby, granted, and that all such claims and causes of action brought by plaintiff, Harvey Yoder d/b/a Marketing Group, against defendant, U.S. Financial Life Insurance Company, be, and are hereby, dismissed with prejudice.

The court further ORDERS that any pending motions in the above-captioned action be, and are hereby, denied as moot.

SIGNED February 7, 2013.

JOHN McBRYDE
United States District Judge

It appears plaintiff wants it both ways: he wants a conversion to be a new policy in one sense so that he can collect first year commissions, but he wants a conversion to be an old policy in another sense so that defendant cannot change the rate at which he is paid the commission.